E-FILED
Friday, 22 October, 2021  05:13:33 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| MIRKO BJELICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-04084-SLD-JEH |
| | ) | |
| WESTERN ILLINOIS UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Western Illinois University's Motion for Summary

Judgment, ECF No. 22.  For the reasons that follow, the motion is GRANTED.

## BACKGROUND[1]

### I.  Defendant Western Illinois University

Defendant Western Illinois University ("WIU") is a public university with a campus in

Macomb, Illinois.  Its student athletes compete in the Summit League, a Division I

intercollegiate athletic conference.  WIU's Director of Athletics is Danielle Surprenant.

Surprenant is white.  Holly Van Vlymen is Assistant Athletic Director for Academics and

Student Athlete Development.[2]

At all times relevant to this suit, WIU offered ten women's athletic teams, including

women's tennis.  At WIU, women's tennis is a "non-core" sport.  Coaches of "non-core" sports

are hired pursuant to one-year temporary contracts.

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, the facts related here are taken from Western Illinois University's ("WIU") statement of undisputed material facts, Mot. Summ. J. 3–12, ECF No. 22; Bjelica's response to WIU's statement of undisputed material facts and additional facts, Opp'n Mot. Summ. J. 2–31, ECF No. 24; WIU's reply thereto, Reply 2–15, ECF No. 26; and exhibits to the filings, which the Court gives descriptive titles for ease of reference.

[2] The record does not specify Van Vlymen's race.

## II.    Plaintiff Mirko Bjelica

Plaintiff Mirko Bjelica ("Bjelica") is white.  He was first hired as WIU's head women's tennis coach in February 2016 pursuant to a contract expiring June 30, 2016.  After Bjelica's initial contract expired, he subsequently received additional one-year contract appointments.

In June 2018, Bjelica again received and accepted a one-year coaching appointment for the period between July 1, 2018 and June 30, 2019.  Bjelica's appointment letter indicated that his duties included "the organization and administration of all phases of a Division I program, the recruitment of prospective student-athletes, supervision of assistant coaching staff and the promotion of positive public relations."  June 6, 2018 Appointment Letter, Surprenant Aff. Ex. 2, ECF No. 22-1 at 15.

## III.    Bjelica's Performance and Surprenant's Concerns

WIU "does not contest there were some ways in which the women's tennis team was successful during Bjelica's coaching tenure."  Reply 3, ECF No. 26.  Under Bjelica's leadership, the team had its first overall winning record in ten years and made the conference tournament.  Off the court, the team was twice recognized by the National Collegiate Athletic Association (NCAA) Intercollegiate Tennis Association for its academic achievement.  The team's fundraising also improved.

Despite these successes, Surprenant reports that she became concerned about whether Bjelica possessed "important leadership factors that build a successful program outside of just wins and losses."  *Id*. at 17.  Her concerns included what she perceived as poor communication with student athletes; failure to demand accountability; lack of concern for student health; and poor student athlete retention, Surprenant Aff. ¶ 15, Mot. Summ J. Ex. A, ECF No. 22-1 at 1–11—all perceptions Bjelica challenges or disputes, Opp'n Mot. Summ. J. 39–43.  Surprenant also

developed concerns related to an October 2018 incident during which Bjelica said the racial epithet "n-----" and was found to have violated WIU's non-discrimination policy.[3]

### A.  Bjelica's Communication with Team Members

Surprenant perceived Bjelica's communication with student athletes as ineffective and sometimes inappropriate.  Surprenant Aff. ¶ 37.  Student athletes complained to her that Bjelica's communications were generally limited to text messages and mobile apps.  *Id.* ¶ 38.  Surprenant states that she discussed Bjelica's use of electronic communication with him at multiple meetings, during which Bjelica "admitted that he relied on electronic messaging to communicate most matters with the team." *Id.* ¶¶ 39–40.  However, Bjelica disputes that he ever made this admission or that he met multiple times with Surprenant, though he "faintly recalls Surprenant mentioning something about not relying too heavily on text messaging in the spring of 2019." Bjelica Aff. ¶¶ 20–21, ECF No. 24-1.

The parties dispute an incident involving student athlete A.M.[4]  According to Surprenant, A.M. received permission from Bjelica to leave campus to obtain a medical scan from March 22, 2019 through March 25, 2019, Surprenant Aff. ¶ 42; when she did not show up at practice on March 25, Bjelica suspended her because he did not realize she would be absent, *id.* ¶ 43. Surprenant reversed the suspension after A.M. showed her a copy of an electronic message she had sent to Bjelica advising him she would not attend that practice.  *Id.* ¶¶ 44–46.  However, Bjelica alleges that A.M. never received permission to be absent March 25.  Bjelica Aff. ¶ 23. Emails show that A.M. received permission to be absent from March 21 to March 24 to obtain

---

[3] Recognizing that this "egregious racial epithet," *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 561 (7th Cir. 2019), "can have a highly disturbing impact," *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004), the Court follows the parties' practice of using "n-----" when referring to the incident.
[4] The parties refer to student athletes by their initials.

vaccines out-of-state.  February 18, 2019 Emails 1–2, Opp'n Mot. Summ J. Ex. E, ECF No. 24-2 at 6–7.

Finally, Surprenant alleges she received complaints from team members that Bjelica made comments such as "women cannot communicate," "men are superior to women at communication," and "women should be in the kitchen" to them.  Surprenant Aff. ¶¶ 47–48.  Bjelica denies making those comments or other inappropriate comments as coach.  Bjelica Aff. ¶¶ 25–26.

### B.  Accountability

Each team at WIU has a point administrator who regularly meets with coaches to review their programs.  Because women's tennis is a "non-core" sport, the team's point administrator was Van Vlymen.  According to Surprenant, Van Vlymen regularly reported that Bjelica did not hold his players accountable for rule violations.  Surprenant Aff. ¶ 31.

Additionally, when Bjelica's daughters enrolled at WIU in January 2018, Surprenant granted Bjelica's request to add them to the tennis team.  *Id.* ¶¶ 32–33.  But Surprenant came to believe that Bjelica's treatment of his daughters adversely impacted the program, *id.* ¶ 34—for example, he spoke to them in Serbian, *id.* ¶ 35, and directed team member C.M. not to communicate with his daughters "as he considered her to be a bad influence," *id.* ¶ 36.

Bjelica disputes these facts.  He contends he did hold students responsible for violations, Bjelica Aff. ¶ 15, submitting to the record a chart dated January 8, 2019 containing "the infractions of the members of [the tennis team] . . . that I, Coach Bjelica, have notes and memories of."  List of Infractions and Consequences 1–2, Opp'n Mot. Summ. J. Ex. D, ECF No. 24-2 at 4–5.  The chart lists 21 infractions with consequences ranging from "[n]o disciplinary action" to "[m]ade the work up" to "[s]ent home from practice" to "[s]uspended."  *Id.*

4

As for his daughters, Bjelica alleges he spoke to them in English "90% of the time" and used only English when addressing the team as a whole.  Bjelica Aff. ¶ 16.  He further alleges he told C.M. to stop communicating with just one of his daughters because C.M. was picking on her.  *Id.* ¶ 17.

### C.  Student Health and Wellbeing

Surprenant did not consider Bjelica to be adequately concerned about student wellbeing, Surprenant Aff. ¶ 17, describing two specific incidents she believes demonstrated Bjelica's lack of concern, *id.* ¶¶ 18–27.  The first incident involved student athlete M.M., who reported to practice feeling unwell and then suffered a serious allergic reaction, *id.* ¶¶ 18, 20—according to Surprenant, Bjelica made her sit through practice rather than send her for treatment, *id.* ¶ 19.  The second incident involved C.R., who injured her elbow during spring break and was told by trainers to play "as tolerated."  *Id.* ¶¶ 21–22.  According to Surprenant, Bjelica then directed her to briefly play in a tournament, despite her protestations that she required rehab before she could compete, so that WIU could field enough players to remain eligible.  *Id.*  ¶¶ 23–27.

Bjelica disputes the characterization of both incidents.  With regard to M.M., he states that she "informed Bjelica she wasn't feeling well in the morning of that day and had all day to get treatment, if she needed it, before practice" at 5:00 P.M.  Bjelica Aff. ¶ 8.  At practice, M.M. appeared in good spirits, and Bjelica asked how she was doing several times.  *Id.*  He contends her hospitalization was unrelated to his decision.  *Id.* ¶ 9.  With regard to C.R., Bjelica explains that only he directed her to play in the tournament "as tolerated," consistent with the trainers' directive.  *Id.* ¶¶ 10–13.

According to Bjelica, emails he sent to athletic staff show that he regularly sent students who needed rehab to trainers.  *Id.* ¶ 14; *see also* March 11, 2019 Emails, Opp'n Mot. Summ. J.

Ex. L, ECF 24-2 at 20 (showing Bjelica emailing athletic trainers to see if they could see a student with an injury).  He also contends he voluntarily provided meals to athletes, hosted a picnic, invited a sports psychologist to a practice, helped players move, and showed up at the hospital at 10:00 P.M. when one player was sick.  Bjelica Aff. ¶ 7.

### D.  Student Athlete Retention

It was not uncommon for WIU's tennis team to have a high turnover rate.  In 2011, 2012, 2013, and 2014, four to five members left the team every year.

At the beginning of the 2018–2019 academic year, there were eight student athletes on the team.  Near the conclusion of that year, one player had been removed from the team, and four had given notice that they were transferring to other programs.  Of the three remaining players, two were Bjelica's daughters.

Bjelica and Surprenant met to discuss the students' departures.  Bjelica stated he had no exact reason but attributed them to "(1) warmer climates elsewhere; (2) the players coming from affluent families; and (3) the players bonding together such that what one did the others would follow."  Surprenant Aff. ¶ 57; *see also* Opp'n Mot. Summ. J. 6.  Bjelica further informed Surprenant that he was getting ready to sign several new players and that fielding the team next year would not be an issue.

### E.  The October 2018 Incident

Five new freshmen joined the tennis team in the fall of 2018, but Bjelica states that these freshmen "showed early on that they did not want to follow the established rules and procedures."  Bjelica Aff. ¶ 53.  One of these students was N.M.   Bjelica recruited N.M. to the team, but after the semester began, Bjelica alleges that she began "show[ing] great opposition to the rules and consequences in place" by skipping practices, missing study hall, and attending a

6

football game instead of a match.  *Id.*  ¶ 58–59.  Bjelica further alleges that N.M. had been using the word "n-----" repeatedly during practice and at events despite warnings to stop.

During an October 4, 2018 practice, N.M. used what Bjelica describes as the "n-word, a-word, and f-word together loudly . . . on the WIU tennis courts in a demeaning context referring to underage prostitution and illegal drug use."  *See id.* ¶ 61.  Subsequently, Bjelica said the word "n-----" when he included it in a list of words he did not want used on the tennis court.

Bjelica alleges that he had an "amicable" meeting with N.M. several days later to discuss the incident, at which N.M. "agreed the issues were resolved."  *Id.* ¶ 63.  Bjelica further alleges that N.M. and Van Vlymen had a meeting that same week, during which N.M. told Van Vlymen that Bjelica's use of the word "wasn't a racial issue."  *Id.* ¶ 64.  But N.M. later filed a formal discrimination complaint against Bjelica, alleging that Bjelica used the word "n-----" during practice and that he dismissed her from the team when she confronted him.

Discrimination complaints at WIU are handled by the Office of Equal Opportunity and Access ("EOA") and handled pursuant to the Policy on Discrimination Complaint Procedures. Chocoletta Simpson, who is African American, directs WIU's EOA office.

In a letter dated January 2, 2019, Simpson informed Bjelica of the complaint against him and its two allegations: first, that he used the word "n-----" during practice, and second, that he dismissed the complainant from the tennis team when she confronted him.  January 2, 2019 Simpson Letter, Opp'n Mot. Summ. J. Ex. M., ECF No. 24-2 at 21.  Simpson directed Bjelica to set up a meeting with her and pointed him to WIU's policies to explain the procedure that would follow.  Her letter contained the word "n-----" in full.

Larissa Malone is N.M.'s mother.  Malone also submitted a formal complaint against Bjelica.  On the morning of January 25, 2019, Malone emailed Simpson, Surprenant, and WIU

general counsel Elizabeth Duvall (whose race is not indicated in the record) to follow up on her complaint and express her belief that during the ongoing investigation, Bjelica should not coach, including at a NCAA tournament that weekend.[5] January 25, 2019, 8:59 A.M. Malone Email, Opp'n Mot. Summ. J. Ex. N, ECF 24-2 at 22–24 ("[D]uring the process, best practices should constitute a separation of Mirko Bjelica . . . from active participation in the women's tennis program."). After receiving a reply from Simpson indicating that her email had been received, Malone responded to ask directly if WIU would allow Bjelica to continue coaching while the investigation remained open. Simpson replied that it would be inappropriate for WIU to share personnel decisions.

The next day, January 26, 2019, Malone attended the NCAA tournament. For an unspecified portion of the tournament, she stood courtside with a sign that read "It is never okay to say 'n-----,'" using the word in full. That afternoon, she emailed Simpson, Surprenant, and Duvall to explain that she had received permission from the hosting coach to engage in "non-violent direct action, to, as Dr. King states, 'create and foster such a tension that a community which has constantly refused to negotiate is forced to confront the issue.'" January 26, 2019, 4:13 P.M. Malone Email, Opp'n Mot. Summ. J. Ex. N, ECF 24-2 at 22–25. Surprenant forwarded that email to then-WIU President Dr. Jack Thomas to update him on what she called the "tennis situation." January 26, 2019, 8:41 P.M. Surprenant Email, Opp'n Mot. Summ. J. Ex. N, ECF 24-2 at 22–25. Thomas is African American.

---

[5] Malone's emails appear to reference another person affiliated with the tennis team who was the respondent in a discrimination complaint (and whose name is redacted from the record), but neither Bjelica nor WIU addresses or makes any argument related to this other complaint.

A meeting was held on January 28, 2019 with Simpson, Surprenant, and Duvall.  At the meeting, notes were made that said "Reinstated – Coach removed? . . . Recommendation – Legal – President."  Meeting Notes, Opp'n Mot. Summ. J. Ex. A, ECF No. 24-2 at 1.

On April 16, 2019, Simpson issued Bjelica a confidential memorandum indicating the result of N.M.'s complaint: Bjelica was found to have violated WIU's non-discrimination policy because he had used the word "n-----."  Specifically, Bjelica had "admitted to using the n-word (n[-----]) and although it was not used in a direct context[,] [i]t is still a derogatory term, inappropriate to use and a direct violation of the Non-Discrimination Policy."  Confidential Memorandum, Opp'n Mot. Summ. J. Ex. K, ECF No. 24-2 at 19.  Simpson's memorandum used the word in full.

Simpson wrote in the memorandum that Thomas would review the investigative report and determine the appropriate action to take.  She further wrote that either party to the complaint could appeal the finding within 10 days due to procedural error or the discovery of new material evidence that was previously unavailable despite due diligence.

On April 23, 2019, Thomas sent Bjelica a letter indicating the actions he determined would be appropriate: a letter of reprimand placed in Bjelica's file; two hours of cultural sensitivity training; the reinstatement of a student to the tennis team; and a new procedure that would require Bjelica and his players to document and sign all disciplinary actions.[6]  Referencing Bjelica's offense, Thomas's letter contained the word "n-----" in full.  *See* April 23, 2019 Thomas Letter, Surprenant Aff. Ex. 6, ECF No. 22-1 at 23.  Bjelica set up a meeting to appeal those actions but was terminated before the meeting took place.

---

[6] The student who was reinstated is presumably N.M.  *See* Bjelica Aff. ¶ 91 .

## IV.     Bjelica's Termination

Surprenant met with Bjelica on at least three occasions to discuss electronic communication, the discrimination complaint, and student athlete retention.  In particular, she stated that she became concerned that the women's tennis team would not have enough players for the forthcoming year.  Surprenant Aff. ¶ 59.  Because she believed it would take time to recruit a new coach and additional time for that coach to recruit new athletes, Surprenant recommended Bjelica's termination before the expiration of his contract.  *Id.*  ¶¶ 60–61.

Bjelica received notice of his termination in a letter from Surprenant on May 1, 2019.  The letter indicated his termination was effective that day and he would be paid out on June 1, 2019.  On May 3, 2019, Bjelica received a second, revised termination letter from Director of Academic Personnel Amy Chambers, whose race is unspecified in the record.  That letter described Bjelica's termination as a nonrenewal of contract and stated that Bjelica would no longer report to work but would be paid and receive benefits through his contract's original end date of June 30, 2019.

On August 12, 2019, Shawn Hyden was hired by Surprenant as the new head women's tennis coach.  Hyden is white.

## V.     Procedural History

Bjelica filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on December 26, 2019, and he was issued a right to sue letter on January 8, 2020.  Compl. 4, ECF No. 1.  On April 6, 2020, proceeding *pro se*, Bjelica brought this employment discrimination suit against WIU under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17.  *See* Compl. 1, 3, 5.  Bjelica alleges that he would not have been terminated but for his race—had he been African American, he would not have been terminated.

*Id*. at 4.  WIU now moves for summary judgment, arguing that Bjelica cannot provide evidence that would support an inference of discrimination or show that WIU's stated reasons for his termination—Surprenant's concerns about his leadership and performance—are pretext for a discriminatory motivation.  Mot. Summ. J. 13–19.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Where one party has properly moved for summary judgment, the non-moving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).  The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).  The court must view the evidence "in the light most favorable to the non-moving party[] and draw[] all reasonable inferences in that party's favor."  *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).  "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a

11

whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

Although courts "liberally construe the pleadings of individuals who proceed *pro se*[,] . . . [e]mployment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes'" at summary judgment. *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1994)). Accordingly, even a *pro se* plaintiff cannot rely on unsubstantiated assertions or subjective opinion to defeat summary judgment. *See id.* at 728–29.

## II.    Analysis

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Under this framework, the plaintiff "carries 'the initial burden . . . of establishing a prima facie case of . . . discrimination.'" *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (second alteration in original) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish a *prima facie* case, "a plaintiff must offer evidence that: '(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *Id.* (alteration in original) (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action—then, if the employer does so,

12

the burden returns to the plaintiff to show that the employer's proffered reason is pretextual.  *See*

*Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722,

728 (7th Cir. 2013).

"*McDonnell Douglas* is not the only way to assess circumstantial evidence of

discrimination."  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir.

2017).  Under *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), the court simply

evaluates "whether the totality of the evidence shows discrimination, eschewing any framework

or formula."  *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021); *see*

*also Ortiz*, 834 F.3d at 766 ("[A]ll evidence belongs in a single pile and must be evaluated as a

whole.").  A plaintiff may present evidence under either, or both, approaches.  *David*, 846 F.3d at

224 (noting the *McDonnell Douglas* framework "survived" *Ortiz* and evaluating the plaintiff's

evidence under both frameworks).  Here, because Bjelica argues he survives summary judgment

under both *McDonell Douglas* and *Ortiz*, *see* Opp'n Mot. Summ. J. 32–33, the Court follows his

lead and considers whether he is able to meet his burden under either framework.

### A.  *McDonnell Douglas*

Ordinarily, a Title VII plaintiff begins establishing a *prima facie* case by showing that

"(1) she is a member of a protected class."  *Burks*, 464 F.3d at 750–51.  However, for non-

minority plaintiffs alleging "reverse discrimination" on the basis of their majority-group

membership, the Seventh Circuit has modified the first prong, holding that such plaintiffs must

instead show "background circumstances which give rise to an inference of discrimination."

*Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454–57 (7th Cir. 1999).  A plaintiff establishes

background circumstances through facts that show "a particular employer has reason or

inclination to discriminate invidiously against whites or evidence that there is something 'fishy'

about the facts at hand." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) (quotation

marks omitted).  However, the other three prongs of the *prima facie* case remain unmodified, and

are no less important.  *Cf. Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (considering the

fourth prong of the *prima facie* case first and affirming summary judgment where the plaintiff

failed to introduce evidence that he was treated less favorably than similarly situated non-white

employees).

    In this case, the Court finds that Bjelica cannot establish a *prima facie* case of

discrimination because he has failed to point to non-white "similarly situated individual[s] . . .

treated more favorably than [him]," *Burks*, 464 F.3d at 750–51.  Bjelica argues that his

comparators are Simpson and Thomas, Opp'n Mot. Summ. J. 38, so the relevant question is

whether Simpson and Thomas are similarly situated as to be suitable comparators in this case.

    "The similarly situated inquiry is a flexible, common-sense one that asks, at bottom,

whether 'there are enough common factors . . . to allow for a meaningful comparison in order to

divine whether intentional discrimination was at play.'"  *Henry*, 507 F.3d at 564 (alteration in

original) (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)).  "[F]actors to

consider include whether the employees 1) had the same job description, 2) were subject to the

same standards, 3) were subject to the same supervisor, and 4) had comparable experience,

education, and other qualifications."  *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir.

2008) (quotation marks omitted); *see also Coleman*, 667 F.3d at 847 ("In the usual case a

plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were

subject to the same standards, and (3) engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish their conduct or the employer's treatment of

them." (quotation marks omitted)).

14

Simpson and Thomas are or were, respectively, WIU's EOA Director and President; Bjelica was a coach, not an administrator. And neither Simpson nor Thomas was supervised by Surprenant or, presumably, any other member of WIU athletic staff. On this surface level alone, Simpson and Thomas are poor comparators.

Bjelica is correct, though, that there are at least some points of comparison: Bjelica, Simpson, and Thomas are all subject to WIU's non-discrimination policy, and none of them used the word "n----" in the "direct" context of using it against another person or in an explicitly disparaging manner. *See* Opp'n Mot. Summ. J. 38. But the Court finds that there are several clear differentiating circumstances that distinguish the two administrators' uses of the word from Bjelica's conduct at the October 2018 practice.

Bjelica identifies several times Simpson and Thomas used the word "n----". In his deposition, he stated that Simpson and Thomas wrote the word in communications to him, which is substantiated by the documents submitted to the record. Bjelica Dep. 5:15–8:2, Reply Ex. A, ECF No. 26-1; *see also* January 2, 2019 Simpson Letter (using the word "n-----" in full); Confidential Memorandum (same); April 23, 2019 Thomas Letter (same). But those were written communications, issued privately to Bjelica, from administrators tasked with enforcing WIU's non-discrimination policy and creating official documentation related to discrimination investigations. *See* Policy on Discrimination Complaint Procedures 2, Opp'n Mot. Summ. J. Ex. G, ECF No. 24-2 at 8–12 ("The finding will be provided to both parties in writing.").

Bjelica identifies one instance when he claims Simpson used the word "n-----" orally. Bjelica Dep. 7:21–23 ("We were discussing different nuances of the word, and I believe that [Simpson] said it as in none of them are appropriate."). However, even if Simpson did say the word, she did so privately, not in front of WIU students, and while meeting with Bjelica about

15

the discrimination complaint in her administrative capacity. *See Kemp v. Indiana*, No. 1:20-cv-00202-JMS-DML, 2021 WL 3709531, at *8 (S.D. Ind. Aug. 20, 2021) (distinguishing the plaintiff's use of "n-----"—in a phone conversation where she told her daughter not to use the word—from the conduct of employees who used the word when complaining about overhearing her conversation because those employees "did so privately to HR, and not loudly in the workplace for others to hear").

Ultimately, the Court finds that Simpson and Thomas's uses of the word "n-----"—in their administrative capacities pursuant to enforcing WIU's non-discrimination policy—are so contextually distinct from Bjelica's use of the word—in front of students at tennis practice—as to preclude "a meaningful comparison in order to divine whether discrimination was at play." *Barricks*, 481 F.3d at 560.

And insofar as Bjelica argues that a similarly situated African American employee would have received more favorable treatment, that argument is based only on conjecture. *See* Opp'n Mot. Summ. J. 45–46. In fact, when Simpson met with Bjelica, she told him that all the "different nuances" of the word were inappropriate. *See* Bjelica Dep. 7:14–23. Bjelica presents no evidence beyond speculation to suggest that an African American employee in his situation would not have been sanctioned for a similar infraction. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (quotation marks omitted)).

Because Bjelica cannot satisfy the fourth prong of the *prima facie* case, the Court need not continue its analysis under the *McDonnell Douglas* framework. *See Henry*, 507 F.3d at 564. However, the Court will still address the facts Bjelica presented in other stages of the *McDonell Douglas* analysis in considering the whole of the evidence under *Ortiz*.

### B. *Ortiz*

Under *Ortiz*, the court evaluates "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958; *see also Ortiz*, 834 F.3d at 766 ("[A]ll evidence belongs in a single pile and must be evaluated as a whole."). For clarity, the Court will organize the facts in categories that reflect Bjelica's arguments: that WIU did not comply with its discrimination complaint procedures, Opp'n Mot. Summ. J. 34–35, 43, 45; that the performance issues Surprenant identified were factually baseless, *id.* at 39–42; and that Larissa Malone either instigated or improperly influenced his termination, *id.* 43–46.

### 1. WIU's Compliance

"Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012). Here, Bjelica argues that WIU failed to comply with its non-discrimination policy in order to "ke[ep] Bjelica's investigation only in the hands of African Americans and g[i]ve Bjelica no route to appeal." Opp'n Mot. Summ. J. 45.

According to the procedures submitted to the record, the "appropriate Vice President" typically determines the sanctions when an employee is found to have violated the discrimination policy, not the President as Thomas did here. *See* Policy on Discrimination Complaint Procedures 4. It may also be true, as Bjelica asserts, that "[a]ll of the vice presidents at WIU at the time of Bjelica's case were white," Opp'n Mot. Summ. J. 29, but there is no evidence that Thomas was involved in Bjelica's case in order to shield Bjelica's case from white administrators. Indeed, at least one white administrator (Surprenant) was already involved, as well as other administrators (Duvall and Van Vlymen) whose races are unspecified in the record. And there is no evidence that any white administrator who Bjelica believes should have been

involved would have been more sympathetic to his case—or, conversely, that the African American administrators involved in Bjelica's case held any particular opinions about Bjelica as a result of his or their racial identities.

Bjelica disputes how WIU determined the actions that were to be taken following the EOA's discrimination finding, but Surprenant states that she did not decide to terminate Bjelica because of the actions Thomas took but because of the underlying investigation result.[7]  *See* Mot. Summ. J. 5 (stating one of the reasons for terminating Bjelica was his "violation of WIU's discrimination policy").  WIU's discrimination complaint procedures indicate that Bjelica would only have been able to appeal the EOA office's underlying finding due to procedural error or previously hidden evidence.  *See* Policy on Discrimination Complaint Procedures 4.  If Bjelica had reason for an appeal on either ground, the procedures dictated the President would be the decisionmaker.  *See id.*  But it appears from the record that Bjelica was appealing not the EOA office's finding of discrimination but Thomas's particular sanctions.  Even a successful challenge to Thomas's determinations would have left the underlying finding undisturbed, so the Court does not find WIU's deviation from its procedures either significant or evidence of pretext.

## 2. Performance Issues

Bjelica next argues the performance issues that Surprenant identified are pretextual because those reasons are dishonest and not factually accurate.  *See* Opp'n Mot. Summ. J. 39–42. "[T]he burden of demonstrating pretext is on the plaintiff who must show that the employer's

---

[7] Bjelica does make an argument related to the particular actions that Thomas decided were appropriate: that Thomas "reinstated N.M. to the team with a phony excuse that next time Bjelica should properly document and have student athletes sign each and every disciplinary action, a procedure that did not exist in the athletic department." Opp'n Mot. Summ. J. 37.  But the Court does not see how the letter from Thomas reasonably supports the interpretation that N.M. was reinstated *because* Bjelica failed to follow the appropriate procedure.  Rather, the letter presents the two actions as unrelated: Thomas was not reinstating N.M. because Bjelica failed to follow the proper procedure when removing her from the team but was rather indicating that in the future Bjelica would have to comply with an additional procedure in order to prevent future incidents and misunderstandings.  *See* April 23, 2019 Thomas Letter.

proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 548 (7th Cir. 2002) (quotation marks omitted).

The Court begins with student athlete retention because this issue "weighed heavily" on Surprenant's mind when deciding to terminate Bjelica, Surprenant Aff. ¶ 60, and the underlying facts are not subject to dispute.  Both parties agree that at the beginning of the 2018–2019 academic year, there were eight student athletes on the team; by the end, five had been removed or planned to depart.  Bjelica's argument is that such turnover was not atypical on the team: four to five members had left in 2011, 2012, 2013 and 2014.  *See* Bjelica Aff. ¶ 100.  But whereas Bjelica blamed funding, *id.*, and weather, *see* Opp'n Mot. Summ. J. 6, for the departures, Surprenant perceived Bjelica as failing to meet the legitimate expectation of student athlete retention, regardless of external forces at play.  *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) (affirming that an employee whose missteps were sometimes beyond his control was still not meeting his employer's legitimate expectations, finding that "[i]f Sun Chemical's legitimate expectation was that a plant manager not pass the buck, then Widmar's brief in which he repeatedly denies responsibility gives further weight to the conclusion that Widmar was not meeting his employer's legitimate expectations").

Bjelica's contention that Surprenant knew he had already recruited new players does not negate the validity of Surprenant's general concerns about retention.  Moreover, that Surprenant did not hire the new coach until August 12, 2019, does not cast doubt on her reason to terminate Bjelica, as Bjelica argues, *see* Opp'n Mot. Summ. J. 36, but instead supports Surprenant's contention that hiring a new tennis coach would take time.  Bjelica presents no evidence that

Surprenant was not proactive in searching for a replacement coach or that the replacement coach would not have recruited additional players if more time were available.

Bjelica further contends that the incidents Surprenant cites as examples of Bjelica's conduct—such as the incidents involving A.M., C.R., and C.M.—did not happen the way they did. But even accepting Bjelica's version of events and assuming the students' complaints against him were unfounded, the fact remains that Surprenant received complaints about Bjelica from students who encountered misunderstandings and miscommunications while on the tennis team and felt aggrieved. *See Bergholz v. John Marshall L. Sch.*, 448 F. Supp. 3d 887, 894 (N.D. Ill. 2020) ("[E]ven though the court assumes that all the complaints . . . were false, the court can consider those complaints for their effect on Dickerson's view of Bergholz. Dickerson could have reasonably credited the deluge of complaints and consequently concluded that Bergholz's conduct presented serious problems in the workplace." (citation omitted)).

Finally, Bjelica argues that all of these performance-related reasons for his termination must have been pretextual because of the notes taken at the January 28, 2019 meeting. Opp'n Mot. Summ. J. 37. His argues that those notes show the decision to terminate him must have been made at that meeting, so incidents that occurred in the spring of 2019 could not have influenced his termination. But Bjelica did not attend the January 28 meeting, so his interpretation of the meaning of the notes is speculation, not evidence. And Bjelica was not terminated until May 2019—precisely, Surprenant maintains, because of the cumulative effect of his performance issues and the discrimination incident.

Letters from professors who opposed Bjelica's termination, *see, e.g.*, Harbke Email, Opp'n Mot. Summ. J. Ex. H, ECF No. 24-2 at 13, and favorable press releases articles about the tennis team, *see* January 22, 2019 Web Post, Opp'n Mot. Summ. J. Ex. J, ECF No. 24-2 at 17, do

not tip the scale in Bjelica's favor. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("[T]he general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated."); *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases . . . give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."). None of these documents provide evidence that call into question *Surprenant*'s belief in Bjelica's poor performance, which is the subject of the pretext inquiry. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 580–81 (7th Cir. 2015).

Although Bjelica believes he should not be held accountable for issues on the team he perceived as beyond his control, Surprenant was free to hold the opposite opinion. *See id.* (finding unreasonable or overly harsh standards were not evidence of pretext when the employee argued the employer's performance goals were impossible). Thus, the Court does not find evidence of pretext here.

### 3. Larissa Malone's Influence

Finally, Bjelica argues that Larissa Malone wanted him removed from the team for "discriminatory and racist reasons" that he suggests Thomas and Simpson shared and perpetuated through their actions. Opp'n Mot. Summ. J. 43–46. It is clear that Bjelica believes Malone's complaint was meritless and hypocritical. *See id.* Other than her emails, the Court has no evidence into her mindset. But whatever Malone's motivations may have been, Bjelica presents no evidence to support what he must attempt to prove, which is that WIU capitulated to Malone's demands because of anti-white bias. *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021) ("Yet[] 'a showing of pretext alone is not enough; the plaintiff must also

show that the explanations are a pretext for the prohibited animus.'" (quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013))).  That Surprenant forwarded Malone's email to Thomas perhaps suggests that WIU administrators were concerned about what Surprenant described as the "tennis situation."  *See* January 26, 2019, 8:41 P.M. Surprenant Email.  But the only evidence Bjelica offers to suggest that WIU's decision was motivated by impermissible racial animus is the fact that Simpson and Thomas, like Malone, are African American, *see* Opp'n Mot. Summ. J. 45–46—and this is simply not enough of a basis to draw that conclusion, *cf. Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 829 (7th Cir. 2006) ("[P]laintiffs must do more than merely point to race and proclaim: 'Aha! Discrimination.'").

### 4.  The Evidence as a Whole

Bjelica's argument relies on the assumptions that all white people would have felt one way about his case, that all African Americans would have felt another, and that every administrator in this case actually held the opinions that Bjelica believes should be ascribed to them on the basis of racial identity alone.  But this is speculation unfounded in the record—and in any event, the decisionmaker who terminated him was white.  Therefore, considering the evidence as a whole, *see Ortiz*, 834 F.3d at 766, the Court does not find Bjelica has met his burden to provide evidence from which a reasonable trier of fact could infer racial discrimination.  Summary judgment for WIU is therefore appropriate.

**CONCLUSION**

Accordingly, the Motion for Summary Judgment, ECF No. 22, is GRANTED.  The Clerk

is directed to enter judgment and close the case.

Entered this 22nd day of October, 2021.

                                                    s/ Sara Darrow
                                        _____
                                              SARA DARROW
                                  CHIEF UNITED STATES DISTRICT JUDGE